829 F.2d 702
 The AMERICAN INSURANCE COMPANY, a New Jersey Corporation,
Plaintiff-Appellee,
v.
C.S. McCROSSAN, INC., a Minnesota Corporation, Midwest
Pipecoating, Inc., a Minnesota Corporation,
Defendants-Appellants.
 No. 85-5355 MN.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1986.
Decided Sept. 30, 1987.
Rehearing and Rehearing En Banc Denied Nov. 11, 1987.
 
 Thomas J. Rooney, St. Paul, Minn., for defendants-appellants.
 Dan K. Prochnow, Golden Valley, Minn., for plaintiff-appellee.
 Before JOHN R. GIBSON, Circuit Judge, FAIRCHILD, Senior Circuit Judge,* and MAGILL, Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Defendants C.S. McCrossan, Incorporated, and Midwest Pipe Coating, Incorporated (a McCrossan subsidiary) appeal from a judgment[1] in favor of plaintiff, The American Insurance Company for the amount of unpaid insurance premiums, retrospectively computed.[2]
 
 
 2
 Plaintiff insurer had issued a general and automobile liability policy and a worker's compensation policy to defendants. The policies covered the period from August 1, 1978 to August 1, 1981. Deposit premiums were paid, but they were subject to adjustment up or down (within an agreed range) in the light of the loss experience of the insureds in accordance with a Retrospective Premium Endorsement.
 
 
 3
 The Endorsement provided for successive annual computations by the Company of a restrospective premium, and for payment by or to the Company of any difference between the premium paid and the premium retrospectively computed. The first computation would take into consideration losses valued at the end of six months after the first policy year, and similar computations would be made annually thereafter until a computation would, under circumstances specified, be deemed final.
 
 
 4
 The first computation (losses valued as of February 1, 1980) resulted in a return of premium to insureds of $266,137; the second (losses valued as of February 1, 1981) in a return of $143,807; the third (losses valued as of February 1, 1982), referred to as the first "full" adjustment, in a return of $252,864.
 
 
 5
 In 1983, plaintiff notified defendants of a second full adjustment, with losses valued as of February 1, 1983. This computation resulted in an additional premium to the Company of $359,632. Defendants paid $100,000. The notification of the adjustment included the statement, "FURTHER ADJUSTMENTS WILL BE MADE." In March, 1984, plaintiff notified defendants of a third full adjustment, with losses valued as of February 1, 1984. An additional premium of $210,665 resulted.
 
 
 6
 Defendants made no further payment, and in June, 1984, this action was brought.
 
 
 7
 Defendants offered no defense to the balance of the second full adjustment. They defended against the third on the basis of language in the Endorsement which they contended made the second full adjustment final, notwithstanding the accompanying notice that further adjustments would be made.
 
 The language relied upon is:
 
 8
 Such further computation [referring to the second full adjustment] shall be final unless, within ninety days from approval of such computation by the organization having jurisdiction [the National Council on Compensation Insurance], the Company requests of such organization or the insured requests of the Company that a further computation be authorized. Any subsequent computations, to be made only at intervals of twelve months, shall each be subject to a similar procedure.
 
 
 9
 The National Council is a voluntary, non-profit organization of insurance companies organized many years ago as a neutral monitor for retrospective premium plans, then an innovation. Although the Company or the insureds might have requested the National Council to verify the second full adjustment, there had been no request, no approval, and no request for authorization of a further computation, up to the time of this lawsuit. After learning that defendants relied on this particular language and claimed a breach of a condition, plaintiff requested Council approval of both the second and third full adjustments, and authorization of the third and further adjustments. All requests were granted except for insignificant reductions on account of errors.
 
 
 10
 The Endorsement provides that the computation shall be made by the Company and nowhere requires the Company to seek approval, specifies the time limits within which to obtain approval, or conditions the obligation to pay the adjustment upon approval by the Council. The Company, in fact, requested authorization of the third adjustment within ninety days from approval of the second, although these events all occurred after the computation of the third adjustment, and the commencement of the lawsuit.
 
 
 11
 Applying the language of the Endorsement literally, the condition was fulfilled by these events and the second adjustment was not final. Accordingly, defendants were liable for the third.
 
 
 12
 We must address, however, a problem which arises from the relationship between the Endorsement and Retrospective Rating Plan D as it stood in 1978, when the policies were issued, and as it was amended in 1980 and 1982. The Endorsement was entitled "Retrospective Premium Endorsement--Three Year--Plan D." The Endorsement made several references to Plan D, but did not incorporate it. One item in a Table elsewhere in the policies read:
 
 
 13
 The premium for the following policies combined is to be computed in accordance with the provisions of retrospective rating plan D in all states where such plan is or becomes applicable on an interstate basis. Subject to the limitations specified here: [sic]
 
 
 14
 Plan D was on file with the Minnesota Insurance Commissioner, and the National Council's 1980 and 1982 amendments were approved by the Commissioner in July and October, 1982.
 
 
 15
 The 1978 version of Plan D provided that after data had been received from the insurance carrier and verified, the premium chargeable shall be promulgated to the carrier by the National Council or other Organization having jurisdiction. It also provided that "a final adjustment shall be made from the second reporting, unless a subsequent adjustment to be made a year later is requested by the carrier or the insured within 90 days after such second adjustment." In 1980, the Council amended Plan D to permit additional adjustments "automatically unless the carrier indicates that the adjustment is final. Requests by the insured for further adjustments shall be made through the carrier within 90 days of such adjustment." In adopting the amendment, the Council noted that in the majority of cases, subsequent adjustments are requested and that permitting the process to remain open until both parties agreed on finality would reflect contemporary conditions.
 
 
 16
 In 1982, the Council amended Plan D so that the premium chargeable shall be promulgated by the carrier; additional adjustments will be made automatically unless the carrier and insured agree that the adjustment is final; and that "[o]n a specific request basis, any premium adjustment computation is subject to verification by the Rating Organization." In making this amendment, the Council noted the increased familiarity of retrospective rating plans and the minimal errors found in verifying the computations of carriers.
 
 
 17
 The Endorsement in this case does not exactly track Plan D either before or after the amendments. It provides for "computation of the retrospective premium ... by the Company" rather than promulgation by the Council. In this respect, it was inconsistent with the unamended Plan D, but consistent with Plan D after the 1982 amendment. It required a request within a ninety-day period in order to avoid finality, and in this respect was consistent with unamended Plan D and inconsistent with the 1980 amendment. It made the ninety days run from approval by the Council rather than from promulgation and was thus inconsistent with unamended Plan D. The 1982 amendment makes approval optional.
 
 
 18
 Defendants point out that under Minnesota statutes a "schedule of rates" includes a system of retrospective rating, Minn.Stat. Sec. 79.01 (1978); a change in rate is ineffective until approved by the Commissioner, Sec. 79.20; a change in rate is to be endorsed on the policy, Sec. 79.21; and a revised schedule of rates applies to new and renewal policies, issued after the effective date of the order adopting them. Plaintiffs have not argued that Plan D, as amended, controls adjustments made after the Commissioner's approval of the amendments. Defendants have not argued that unamended Plan D overrode the parts of the Endorsement inconsistent therewith.
 
 
 19
 Defendants argue for a construction of the critical language of the Endorsement whereby the ninety-day period would run from the insurer's promulgation of the second full adjustment. As they put it, "[s]ince the act formerly constituting the approval by the rating organization now is done by the company the promulgation date should be regarded as the approval date." Defendants emphasize the ordinary rule that ambiguities in an insurance contract should be resolved against the insurer. Bituminous Casualty Corp. v. Swartout, 270 Minn. 216, 221, 133 N.W.2d 32, 36 (1965).
 
 
 20
 Magistrate McNulty concluded, as have we, that according to the literal terms of the Endorsement, the ninety-day condition had been fulfilled. He went on, however, to assume the construction for which defendants argue, and a breach of that condition, and found the breach was not material.
 
 
 21
 The Restatement (Second) of Contracts Sec. 229 (1979) provides:
 
 
 22
 To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.
 
 
 23
 Comment B: Disproportionate forfeiture. The rule stated in the present section is, of necessity, a flexible one, and its application is within the sound discretion of the court. Here, as in Section 227(i), "forfeiture" is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange.... In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture....
 
 
 24
 The Council, in fact, approved the second adjustment and authorized and approved the third. There is nothing at all to suggest that approval of the second and authorization of the third would not have been granted if requested immediately or within ninety days from the second adjustment. The third adjustment was correctly computed, and only the claimed breach of condition stood in the way of recovery of over $200,000 additional premium warranted by the loss experience. A request for authorization made within ninety days of the second adjustment would have done no more for defendants than inform them that the second adjustment was not final. In fact, they received equivalent notice simultaneously with billing of the second adjustment. Fulfillment of the alleged condition would not have afforded defendants any significant protection.
 
 
 25
 We find no abuse of discretion, and agree with the view of the magistrate.
 
 
 26
 The judgment appealed from is AFFIRMED.
 
 
 
 *
 The HONORABLE THOMAS E. FAIRCHILD, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 The judgment was entered in the District Court for the District of Minnesota, Honorable Patrick J. McNulty, Magistrate, having conducted the proceedings upon consent of the parties
 
 
 [2]
 Jurisdiction was founded on diversity. The parties have treated Minnesota law as controlling substantive questions